THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE  CfVLR 5.4
(Rule Number/Section)

```
___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

    OCT 04 2022

CLERK U S DISTRICT COURT
  DISTRICT OF ARIZONA
BY_____ DEPUTY
```

David Cupples
344 W Hollamon St, Apt 4
Camp Verde, Az  86322
928-202-6202
davecupples@yahoo.com

*Plaintiff, pro se*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

---

David Cupples,

        Plaintiff

Case No   CV-22-8183-PCT-DWL

v.

**COMPLAINT**

Catholic Charities Community
Services, Inc,

        Defendants

---

Plaintiff files his complaint and states as follows:

## **PARTIES**

A. David Cupples, Plaintiff
    1. At all times relevant to this action Plaintiff was and remains a resident of Verde Valley, AZ and Yavapai County, AZ

B. Defendants
    1. Catholic Charities Community Services, Inc

4747 N 7th Ave
Phoenix, AZ 85713
602-285-1999
scapobres@cc-az.org

2. At all times relevant to this action Defendants (Catholic Charities Community Services or its agents) (hereinafter, "Defendants") have offered and do still offer services in Verde Valley, AZ and Yavapai County, AZ.

## JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over this Complaint pursuant to 28 USC sect 1331, and under the Federal Fair Housing Act, 42 USC sect 3601 et seq (hereinafter, "FHA").

2. All actions of the Defendant which constitute violations of the FHA occurred within Yavapai County, Arizona.

## GENERAL ALLEGATIONS

3. Plaintiff is an individual with a severe, chronic disability known as Complex PTSD. This disability began in childhood as the result of chronic traumatic abuse that was ongoing throughout childhood.

4. Complex PTSD (C-PTSD) includes all the symptoms of simple PTSD, plus additional symptoms. Some symptoms of C-PTSD are so common that they are considered indicators of the disease.

5. For a diagnosis of C-PTSD--as opposed to simple PTSD--certain symptoms must be present. One of these is a tendency to "over-react to

events". Plaintiff does have a strong tendency toward over-reaction, and this confirms which of the two basic forms of C-PTSD is present in Plaintiff.

6. "Difficulty with personal interactions" is another of the characteristic indicators of the disease. For example, throughout his life, Plaintiff typically had difficulties interacting with parents, teachers, and employers—people in authority--but also friends.

7. A "persistently negative self-concept" is also always present in the complex form of PTSD. A C-PTSD patient will usually blame himself for whatever happens and beat himself up because of it.

8. Paranoia or a "sense of present danger" is characteristic of both the simple and complex forms of PTSD.

9. These characteristics and indicators of C-PTSD are very important to Plaintiff's situation as they demonstrate how Plaintiff's difficulties with Defendants are actually predictable if no action occurs to mitigate the threat and stress that Plaintiff feels.

10. Defendants past actions cause Plaintiff's paranoia to always be on heightened alert when dealing with Defendants. Frequent unscheduled visits by Defendants, constant efforts to enforce sometimes questionable authoritarian rules and dictates, repeated efforts to evict Plaintiff, and the over-encompassing authoritarian tone of the whole relationship as it exists causes Plaintiff to be in constant confusion and fear of "What's

next?" This is the context of the relationship. Unfortunately, it serves to exacerbate Plaintiff's mental disability.

11. It does not matter if the threat is not real or is actually at a lower level. What counts in Plaintiff's disability is what he feels, not necessarily what is real. This is what controls his actions. <u>It is important to note that Plaintiff feels threatened in many of his interactions with Defendants</u>. This can cause Plaintiff to react in inappropriate ways.

12. Specifically, Plaintiff especially has difficulty in relationships with people in positions of power and/or authority (e.g., parents, caseworkers, etc). To this point, Plaintiff has had extreme difficulties with employers throughout his working life, and estimates the length of his jobs was typically only 3 to 6 months,.

13. Plaintiff's difficulty holding a job created a chronic, repeating cycle of homelessness, as well as repeated loss of personal property since Plaintiff was unable to keep up with home and/or storage unit rental payments. These factors help fuel Plaintiff's feeling that the world isn't safe and is out to get him. Also, in the present, the cycle is repeating again with Plaintiff's home and possessions threatened.

14. C-PTSD patients typically react the same way to a similar stimulus. It's commonly known that C-PTSD patients have "triggers"—something that causes them to associate a current event with something traumatic from their past—and when they experience one of these triggers, the

patient will react very much the same way he did to the original event. The reactions of C-PTSD are usually predictable since they are repeating, but they are extremely difficult to control.

15. Therefore, it is common for people with C-PTSD to seek to avoid situations likely to trigger the disease, so predictably, Plaintiff tries to limit his interactions with "authority figures" like agents of Defendants.

16. Other things that tend to trigger Plaintiff's C-PTSD are ritual activities without real or apparent purpose, "one-size-fits-all" rules that may not have purpose or meaning in their immediate context, authoritarian dictates or rules, or an authoritarian manner, and generally, many rules of the type that organizations will typically adopt to ease their own responsibility and/or liability. The point is Plaintiff has difficulty with authority that seems arbitrary.

17. Because Plaintiff and Defendant have a relationship that spans several years, actual experience helps fuel Plaintiff's feelings that Defendants are out to get him as Defendants have routinely and repeatedly placed Plaintiff in situations that they know are problematic and likely to "trigger" Plaintiff.

18. Also because of Plaintiff's previous experience with Defendants and his ongoing frustration, Plaintiff lacks the normal buffer that most people have that gives them a moment before reacting, like a slow burn period.

Plaintiff's C-PTSD and tendency toward over-reaction cause him to react immediately.

19. Whenever one of these problematic situations occurs, Plaintiff routinely reiterates his request for some reasonable accommodation in the way Defendants approach and communicate with Plaintiff to prevent a re-occurrence. Defendants routinely refuse.

20. On February 29, 2016, Plaintiff signed a lease with Defendants and entered into a relationship whereby Defendants would subsidize Plaintiffs rent, <u>based on the fact that Plaintiff is disabled and Seriously Mentally Ill (SMI)</u>.

21. The program under which Plaintiff is housed is <u>funded by Arizona's state Medicaid program</u>, also known as AHCCCS. Therefore, the housing that Defendants provide and subsidize is actually part of Plaintiff's health care. It is not simply housing. Let me repeat, <u>Plaintiff is housed under a program for mentally disabled people</u>. <u>Plaintiff's housing is actually provided as part of his health care</u>.

22. In July of 2019, Defendants, by their own choice, moved Plaintiff to a new residence at his current location in Camp Verde. It is required of all tenants at this specific property that they be qualified as SMI, so again, Defendants were very much aware that Plaintiff is mentally disabled.

23. Plaintiff has done well in this health care and housing program administrated by Defendants. Plaintiff gets along with his neighbors

reasonably well.  Plaintiff gives rides to his neighbors and is available to help whenever needed.

24. Since moving into his current apartment, Plaintiff has quit drinking, has established credit with a limit above minimal, and has recovered some, but not all of his good health.  Plaintiff donates money to charity, and is taking a more active interest in community and civic affairs.

25. Plaintiff has a BA in Creative Writing from the University of Arizona, and has had three commentaries published in his local *Verde Independent* newspaper in recent months, as well as several "Letters to the Editor".

26. So, while participating in this health care/housing program, Plaintiff has recovered from homelessness to a large degree and established a relatively stable and productive poor-class life, and is showing aspirations toward even greater improvement.

27. Defendants knew at the beginning of the landlord/tenant relationship that Plaintiff is SMI and that his mental disability is one of the qualifying factors.  It's puzzling that it is now being used to evict Plaintiff.

28. In spite of being well aware of Plaintiff's disability and the difficulties it poses for him, as well as having their own personal experiences with these difficulties, Defendants have never made any good faith effort to mitigate the difficulties.

29. Defendants have routinely refused to either extend or abide by any reasonable accommodation for Plaintiff's mental disability in the way they approach and communicate with Plaintiff.

30. Defendants have never consulted with Plaintiff's therapist or Psychiatrist for information or assistance.

31. Defendants have routinely placed Plaintiff in threatening situations. For example, in the summer of 2021, a caseworker for Defendants, Elva Cruz, instigated a series of unannounced visits during which Defendants wanted Plaintiff to answer questions about the Plaintiff's apartment and personal life. It should be understood that many of the questions like, "Do you have furniture in your apartment?", were really nonsensical since Defendants have been in Plaintiff's apartment many times and know very well he has furniture. Plaintiff asked the purpose of the questions, but Defendants had no answer. Somebody just told somebody to do it.

32. Plaintiff did answer the questions one time. However, Ms Cruz came by several times with the same nonsense questions and when Plaintiff objected, Ms Cruz stated that <u>she was going to come by every week with the same questions and that if Plaintiff refused to answer he would be served a "Notice of Noncompliance"</u>, the first step toward eviction. Ms Cruz was very angry, as well as authoritarian in her demeanor, during this series of events and seemed to take the whole thing personally.

33. Because of the incidents with the questions, Plaintiff asked for a reasonable accommodation not to answer them over and over and not to be visited repeatedly. The actual author of the questions, Cory Runge, agreed, stating that the questions hadn't really been meant for Plaintiff, but Ms Cruz persisted.

34. This incident led to Plaintiff actually being served a Notice of Noncompliance. Eventually, the conflict was resolved when Defendants agreed not to keep asking questions repeatedly, agreed to keep Ms Cruz away from Plaintiff, and further agreed to assign a new caseworker for Plaintiff. However, just a few months later, <u>Ms Cruz again dropped by unannounced for no clear purpose</u>. This was clearly harassment in spite of the fact that Plaintiff had repeatedly asked for a reasonable accommodation concerning the nonsense questions and Ms Cruz.

35. This policy to pressure Plaintiff may have started in August of 2019, just one month after Plaintiff was relocated to his current apartment. At that time Defendants started legal proceedings that would have ended in Plaintiff's eviction, but then halted the action. To this day, Plaintiff is still not sure of the reason for that action. Plaintiff has asked several times for some explanation, but Defendants have refused to provide an answer.

36. Throughout the landlord/tenant relationship, Defendants have routinely sought to walk through Plaintiff's residence on occasion for some inspection or, at times, seemingly for no real purpose. Because

Defendants partner with various other organizations for administration of their program or for funding purposes, several inspections have occurred within a one-year period.

37. Plaintiff has asked Defendants to please limit the number of inspections. Plaintiff suggested that one remedy could be to coordinate between all organizations and purposes for inspections so that it could all be done in one day, for example, or at least that some coordination could reduce the number of inspections to some more reasonable number.

38. Defendants have claimed in the past that all these several inspections were necessary, but upon inspection of their own rules last year, Defendants learned that only one inspection per year is actually required, so they admitted that Plaintiff was correct that the number had been excessive.

39. Defendants also routinely "drop by" unannounced to "visit" with Plaintiff for no reason, but just to check on Plaintiff, or perhaps for some specific purpose, but these drop-in visits are hard on Plaintiff as one of his coping mechanisms is to try and avoid surprises and new situations and, especially, situations known to cause him difficulty. Another coping mechanism—if Plaintiff has notice of a visit—is to prepare for the visit based on his last experience. This helps ease Plaintiff's fears and temper his reactions. For example, inspections did get easier over time as Plaintiff learned what to expect during an inspection.

40. Defendants also routinely drop off written notices or "drop by" to leave a verbal notice early on a Friday afternoon. If these notices are vague or threatening in tone--as they often are--this causes Plaintiff great distress.

41. Notice might be given on any day, but Fridays are especially troubling for Plaintiff because, when a threatening or vague notice is delivered early Friday afternoon, the lack of details and specifics will alarm Plaintiff and begin to trigger his C-PTSD. Plaintiff will feel that he is being accused of something (in many cases he is accused), and he will seek clarification on details or will ask what authority is behind the notice.

42. However, typically, everyone at Defendants' place of business goes home early on Fridays, so no one is available to answer questions. The nature of Plaintiff's disability, especially his tendencies toward "negative self perception" and "over-reaction", is such that the lack of details will cause him extreme, real distress over the whole weekend, which, including the Friday, can be 4 days on a holiday weekend.

43. This is the kind of thing that triggers Plaintiff's paranoia and causes him to feel that Defendants are out to get him. Plaintiff has made Defendants aware of this many times while at the same time requesting some reasonable accommodation.

44. The whole game plan and method of Defendants, concerning visits, inspections, and all manner of contact, is authoritarian and strong-arm and makes Plaintiff feel as if Defendants are trying to exercise supervision

over his whole life. Plaintiff maintains he is still a free man while accepting a rent subsidy, but Defendants' actions seem <u>designed</u>, like an ambush, to anger and trigger Plaintiff and trap him into bad behavior.

45. This is hard on Plaintiff. The C-PTSD does tend to cause Plaintiff to get angry and to over-react with his emotions rather than his intellect, which is why Plaintiff tries so hard to devise coping methods like limiting contact with authoritarian figures and other methods that Plaintiff has noted above.

46. Finally, after years of requests by Plaintiff, Defendants did agree to some reasonable accommodations to help improve the situation when signing the last lease on October 21, 2021. Those terms were asked for specifically to help improve communication between Defendants and Plaintiff, and were as follows: 1) Defendants will not give, leave, or deliver notices on a Friday when no one is available to give details or answer questions; 2) That Defendants will not deliver notices that are vague and lacking in details; 3) That Defendants will not drop by without prior notice, but instead, will call and make an appointment to meet Plaintiff; 4) That Defendants will only come by for specific and required purposes, and not just visit casually or "when in the neighborhood".

47. Recently, Plaintiff also stated to Defendants that other reasonable accommodations might be indicated and suggested that Plaintiff's therapist should be included in a discussion so that Plaintiff and

Defendants can avoid these common problems in the future and can share a more harmonious relationship.

48. Plaintiff has repeatedly stated to Defendants his willingness to work with them if Defendants will agree to and abide by some reasonable accommodations in the way they approach and communicate with Plaintiff.

49. Recently, on <u>Friday</u>, July 8, an agent for Defendants, Anthony Cruz, <u>"dropped by" Plaintiff's apartment to give him notice that the owners were coming in 2 weeks to "clean"</u>. Plaintiff asked what was meant by "clean" and Mr Cruz responded that he didn't know what was meant by the message, but that the message was from Ms Valerie Ogden, the property manager and agent for the owner's group.

50. Plaintiff then made a series of phone calls to the property manager and to Defendants in an effort to get details, but as has been described above in general terms, everyone had already gone home for the weekend.

51. This is exactly the situation that Plaintiff has sought to avoid when asking for the reasonable accommodations (described above) that Defendants did finally agree to. Every part of Defendants' actions were a clear violation of the reasonable accommodations agreed to.

52. Subsequent to that weekend, Plaintiff received a notice from Valerie Ogden, dated 7/28/22, indicating that agents of the Defendants would be

coming on August 12 to seize "unauthorized" personal property for disposal, including personal property belonging to Plaintiff.

53. No property had previously been identified to Plaintiff as "unauthorized". This is a clear violation of Plaintiff's Fourth Amendment rights.

54. Plaintiff again made phone calls to Defendants seeking clarification. One call to Mary Cannon, the "Quality and Risk Administrator" for Catholic Charities, should have instigated a grievance complaint by Plaintiff--Ms Cannon is the designee to receive such complaints—but instead, that call was used to begin eviction proceedings against Plaintiff.

55. This surprising action by Defendants is indicative of the fact that Defendants have never accepted any responsibility for the ongoing friction with Plaintiff or for the ongoing violations of Plaintiff's FHA rights.

56. Defendants refuse to extend and abide by any reasonable accommodations for Plaintiff's disability. Furthermore, Defendants also refuse to accept responsibility for the recent violations of the very accommodations they did agree to while signing the last lease, specifically, <u>dropping by on a Friday to deliver notice deemed to be vague and threatening</u>.

57. Defendants' recent actions violate both the letter and the spirit of the accommodations they agreed to.

58. Plaintiff has received notice that he must vacate premises by September 30, 2022 or Defendants will begin eviction process.

59. Plaintiff has tried to reconcile the situation with Defendants. Plaintiff attended a zoom meeting and a phone meeting, both supposedly for the purpose of reconsidering the decision to evict and resolving the differences. One meeting was actually called an Appeal Hearing, but both Defendants who served as the hearing officers admitted that they had no authority to grant any reconsideration or appeal, or to change any decision.

60. Plaintiff doesn't know how to qualify those meetings, but there is clearly something fishy about an Appeal Hearing where the Hearing Officer has no authority to grant an appeal.

## REQUEST FOR RELIEF

a. First, Plaintiff requests that the eviction proceedings be halted immediately and reversed. The only reason this incident occurred is because Defendants violated their agreement with Plaintiff. Plaintiff is the one who was damaged in this incident, not Defendants.

   1) Also, eviction is not warranted for an elderly man who may in fact be a <u>grumpy old man</u>, just because of a little landlord/tenant friction. Eviction would serve no purpose except to create another homeless man. It will not cure Plaintiff's mental disability. It will

also not cure Defendant's problem because the next person to move in will also be SMI, and his illness might be even more difficult than Plaintiff's.

2) Plaintiff has applied for alternative low-income housing, but the waiting list in the Verde Valley is 3 years, so there is no alternative housing available.

3) Eviction would damage Plaintiff's credit which he worked hard to establish while also working hard to reestablish himself as a productive citizen.

4) Furthermore, because of Plaintiff's history of mental illness and repeated homelessness and all the suffering that goes with that life, another eviction at the age of 69 is just one more attack on a man who has tried to remain a good, productive citizen throughout a difficult life. At his age and with his health issues, an eviction at this point is probably a slow death sentence for Plaintiff.

5) Because of health issues, Plaintiff is at extra risk from exposure and also from any task requiring physical labor (due to hernias). Just moving is a threat to Plaintiff's health because of the lifting required. Plaintiff has been estranged from his family for decades and has no close relationships with friends at present. Life changes. Homelessness is always a challenge, but for this 69 year old man, it could be fatal.

b. Second, Plaintiff seeks relief in the form of a clear agreement with Defendants that provides reasonable accommodations for Plaintiff's disability. Plaintiff suggests that he and Defendant consult with Plaintiff's therapist and devise a plan for future interactions that will be less threatening to Plaintiff.

c. Third, Plaintiff further suggests that just bringing the issue out in the open so that all parties are aware of it will immediately offer great relief. When everybody including the defendants are aware that the triggering is occurring, it makes it so much easier to avoid a real blowup. Somehow, it helps defuse the anger from the situation on both sides.

d. Fourth, to that end, Plaintiff suggests that Defendants consider some education and training for staff, caseworkers, and anybody in their organizations likely to make contact with C-PTSD patients. Plaintiff has already arranged for his therapist, Suzanne Connolly, (a world-class authority on C-PTSD) to give a class whenever Defendants are ready. A little awareness can help a lot in these situations.

e. Fifth, Plaintiff also requests that parties review the agreement after some agreed upon time to determine if adjustments in the agreement may be necessary.

## CERTIFICATION & CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law of by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the 'clerk;s Office may result in the dismissal of my case.

Dated this 3rd day of October, 2022

By  *D Cupples*

David Cupples